UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JOHN SYLVE                                                                                    CIVIL ACTION

VERSUS                                                                                         NO. 14-1180

N. BURL CAIN, WARDEN                                                            SECTION "G"(1)

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2). Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE.**

Petitioner, John Sylve ("Sylve"), is a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.[1] On September 24, 2008, he was convicted of second degree murder under Louisiana law.[2] On October 9, 2008, he was sentenced to a term of life imprisonment without the benefit of probation, parole, or suspension of sentence.[3] The First Circuit Court of Appeal affirmed his conviction and sentence on September 11, 2009,[4] and the Louisiana Supreme Court denied his related writ application on April 9, 2010.[5]

---

[1] Rec. Doc. No. 5, Petition.
[2] State Rec., Vol. 2 of 4, Trial Transcript, 9/24/08; State Rec. Vol. 1 of 4, Minute Entry, 9/24/08.
[3] State Rec., Vol. 1 of 4, Minute Entry, 10/9/08.
[4] *State v. Sylve*, 2009-0643 (La. App. 1 Cir. 9/11/09) (La. Ct. App. Sept. 11, 2009); State Rec., Vol. 3 of 4; 1st Cir. Opinion, 2009-KA-0643, 9/11/09.
[5] *State v. Sylve*, 2009-2168 (La. 4/9/10), 31 So. 3d 380; State Rec., Vol. 4 of 4; Supreme Court Order, 2009-KO-2168, 4/9/10.

On or about September 1, 2010, Sylve filed an application for post-conviction relief with the state district court.[6] That application was denied on August 23, 2012.[7] His related writ applications were then likewise denied by the Louisiana First Circuit Court of Appeal on January 15, 2013,[8] and by Louisiana Supreme Court on September 13, 2013.[9]

On or about June 9, 2014, Sylve filed a petition for federal *habeas corpus* relief.[10] In his federal petition he asserts four claims: (1) denial of his constitutional right to confrontation; (2) outside influences constructively denied him a fair trial; (3) ineffective assistance of counsel; and (4) insufficient evidence.[11] The State concedes the application is timely and that his claims are properly exhausted.[12]

## I.    *Standards of Review*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both. The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28

---

[6] State Rec., Vol. 3 of 4, Application for State Post Conviction Relief, 9/1/10.
[7] State Rec., Vol. 3 of 4, Judgment on Post Conviction Relief with Reasons, 8/23/12.
[8] State Rec., Vol. 3 of 4, 1st Cir. Order, 2012-KW-1938, 1/15/13.
[9] State Rec., Vol. 3 of 4, Supreme Court Order, 2013-KH-0310, 9/13/13.
[10] Rec. Doc. 5, Petition.
[11] Rec. Doc. 5-1, Memorandum in support of petition.
[12] Rec. Doc. 13, State's Response.

U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." *Bell*, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.
>
> *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of

3

a particular prisoner's case." *White v. Woodall*, 134 S.Ct. 1697, 1706 (2014). However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

*Id.* (citations and quotation marks omitted). Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted). The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694. Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief. *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so. As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard

4

> against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement*.

*Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 786–87, 178 L.Ed.2d 624 (2011) (citations omitted; emphasis added); see also *Renico v. Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1866, 176 L.Ed.2d 678 (2010) ("AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

## II.    Facts

On direct appeal, the Louisiana Fourth Circuit Court of Appeal laid out in detail the facts of this case:

> On or about November 20, 2003, at approximately 2:00 a.m., Officer Jacob Swable and Sergeant Lewis N. Sanders of the St. Tammany Parish Sheriff's Office were dispatched to the home of the defendant, John Sylve, and his wife, Sharon Sylve, in Slidell, Louisiana for a medical emergency involving an unresponsive four-year-old boy, Troy August, the victim. An ambulance was also dispatched to the scene. On arrival, Officer Swable noted what appeared to be burn marks down the victim's legs, on top of his feet, and around his knee area. He further noted that the child appeared lifeless. According to Sergeant Sanders, the body was becoming stiff. Sergeant Sanders also noted multiple visible injuries including discoloration around the child's groin area. The victim was in the custody of the defendant and his wife.
>
> The emergency dispatch took place during the early morning hours on a Thursday. When Officer Swable arrived at the scene, he observed Sharon Sylve holding the seemingly lifeless victim. The defendant stood behind her in the doorway of the home. Sharon Sylve was screaming and hollering, while the defendant appeared calm. Officer Swable testified that the victim's right eye was partially open, his left eye was closed, and he was clothed solely in a pair of white underwear. Officer Swable began administering CPR before transferring the child to the paramedics. Sharon Sylve said the victim had sat in a tub of hot water. Officer Swable noted that the bottoms of the victim's feet were not burned.
>
> Before the autopsy, the police interviewed the defendant and his wife. The defendant stated that he and his wife were in bed when they heard the victim yell after another child had been instructed to give him a bath. They realized the

victim had been burned and attempted to administer first aid to the child. They did not believe the injuries were serious. The defendant's wife provided a consistent statement. The defendant also stated that he and his wife took custody of the victim from a relative to have a playmate for the other child in their care.

Dr. Michael DeFatta, an expert in forensic pathology, performed the autopsy. At the time of the autopsy, the victim was forty-one inches tall and weighed forty pounds. Dr. DeFatta described the victim as thin and noted the victim did not have any food or liquid in his stomach or small bowel. Multiple photographs taken during the autopsy showed that the victim had second and third degree burns on the buttocks and scattered abrasions on his right arm, shoulder, armpit, abdomen, and his legs. The victim had abrasions on the left side of his neck that were curvilinear and a linear abrasion and open laceration on his face. Dr. DeFatta noted that the scrapes and abrasions were consistent with fingernail marks or wounds from being beaten with a slender stick (a "switch"). The time of the infliction of the various injuries on the victim's body ranged from hours to days before the autopsy, as some of the injuries had visible signs of healing. He stated that short of the scars, the recent and healing injuries took place within a five-week period in which the defendant had custody of the child.

The right side of the victim's face had scratch marks, and curvilinear, C-shaped scrapes on the right side of his neck that were indicative of fingernail marks. The back of the victim's left leg and buttocks area had splotchy burned areas. There were burns on the inside of both of his thighs and the entire right buttocks area. Also present in that area was a white substance that appeared to be paint or plaster. More abrasions were scattered within the burned area. The victim had several loop marks on his right arm and from the bottom of his neck to his buttocks, classic injuries that can occur as the result of having been beaten with a twirled chord. Dr. DeFatta stated that the burns on the victim's legs were mainly second degree, but included small areas categorized as third degree burns. Some of the burns may have taken place approximately six days before the autopsy, as the edges of some of the burns were starting to form a yellow, grayish color and had a coating on the surface identified as granulation tissue that is seen when an injury starts to heal. The victim's upper lip had a severe bite mark caused by blunt-force trauma such as being hit in the mouth. His entire lip was busted open and should have been stitched. Yellow and dark discoloration and infection formed because the injury was not treated.

Dr. DeFatta noted that the bottoms of the victim's feet were spared. Dr. DeFatta testified that the victim's injuries were not consistent with immersion burns, which occur when the body is submerged into extremely hot water. He specifically noted that immersion burns are band-like, confluent, and have universal patterns, not splotchy. Dr. DeFatta also noted serious burns on the victim's right knee, along his left ankle, on his right foot, and a section of his right leg with more burns and missing pieces of skin. The victim's right hip had a long area encompassed in a burn with bruising and abraded areas where the skin was

broken due to some type of beating with an object. The victim's buttocks had skin missing off of it and portions of his left buttock had stripes and loop marks, and bruising on a burned area. Dr. DeFatta estimated that the injuries to the victim's buttocks causing hemorrhaging (bleeding into the soft tissues) occurred days before the autopsy. The victim's scrotum area and around the legs had more white material and deeper, third degree burns. These injuries were also described as splotchy, not confluent or band-like distribution as caused by immersions of the buttocks. The burns in the penis and scrotal area had become infected. Dr. DeFatta explained that the victim must have had pain and burning during urination and defecation. The victim had bruising on his forehead, a subdural hematoma, significant bleeding between the brain and its covering, and brain swelling, consistent with an injury caused by a blow to the head or for children, during shaking or a rotational type of injury.

Dr. DeFatta testified that the victim needed immediate medical intervention. The subdural hematoma was one of the major causes of the victim's death. The victim's toxicological blood and urine results showed metabolites for breakdown products of cocaine and cocaine in its natural form. Assuming that the cocaine was acquired orally (as typically administered to children having cocaine detections), Dr. DeFatta estimated the time of cocaine use was near the time of the victim's death. Dr. DeFatta added that there was no circumstance under which the cocaine could have been consumed more than five weeks before the victim's death. According to the autopsy analysis, twenty percent of the victim's body was burned. The cause and manner of death was battered-child syndrome. Dr. DeFatta explained that battered-child syndrome occurs when a child has undergone undue stress or trauma such that the child has recent injuries at the time of death as well as older, healing injuries. Such children usually have a head injury that could cause bleeding and/or hemorrhage into soft tissue from excessive bruising and beatings ultimately leading to their death. Dr. DeFatta further testified that the cocaine administration was also a significant factor. The victim's death was classified as a homicide.

After the autopsy, the defendant agreed to give another statement to the police, including a recorded statement. The defendant stated that the victim had lived with him for almost five weeks. The other child living in the home was eight years old. The defendant initially repeated his first explanation, but ultimately stated that the burning incident actually occurred on Saturday instead of the Tuesday before the victim died. The defendant stated that he did not initially call for assistance because his wife asked him not to and because he feared losing custody of the other child. The defendant indicated that his wife would beat the victim and that she hit him on the buttocks with a belt and/or switch on and surrounding the burned areas. The defendant stated that he did not know why his wife would beat the victim and referred to him as "innocent" and "sweet." The defendant admitted to whipping the victim on his buttocks, but denied beating the victim after he was burned. He also indicated that he hit the victim's hands. The defendant stated that he spanked the victim to try to induce him to cry. The

defendant whipped the victim with a switch one time because he wanted to see him cry and tried whipping him in his hand to see if he could make him frown. When asked why he would spank the victim, the defendant stated that the victim "use to do so much" and added that he "did not whoop him for everything he did." The defendant further explained that he whipped the victim for disciplinary reasons. The defendant denied drug usage, but stated that his wife used cocaine and that they both drank beer.

The execution of a search warrant for the defendant's residence resulted in the seizure of a powder-like substance that was located in the master bedroom and later determined to be cocaine. The officer photographed several items including discarded cords, several belts, and towels and bedding that appeared to be bloodstained.

The defendant's trial testimony was essentially consistent with his recorded statement. The defendant testified that his wife was the main caretaker for the children while he worked outside of the home. The defendant further testified that he was getting ready to leave the home when the victim was injured. When he returned, he noticed that the victim's burns were worse than he initially believed. His wife was crying and he felt sorry for her. His wife asked him not to contact a doctor. The defendant denied striking the victim in the head or shaking him. He further stated that he never saw his wife shake the victim. He added that he spanked the children when they needed it, specifying that it was "[n]ot that much" and "on his [the victim's] butt."

On the night of the victim's death, he was sleeping with the defendant and the older child. The defendant's wife was out with friends. Around 1:30 a.m., the defendant noticed that the victim was not breathing. The defendant called his wife who was approximately ten minutes away from their home at the time and told her to call 911. The defendant gave the victim CPR until emergency assistance arrived. The defendant testified that he knew the victim was hurting from the burns and "probably" bleeding.

### III.   Petitioner's Claims

####    1.  Denial of right to confrontation

Sylve asserts in his first claim that he was denied his right to confrontation when Dr. DeFatta, the forensic pathologist who performed the autopsy on the victim, was allowed to testify from the coroner's investigative report. Vincent Tragonal had prepared the investigative report and was not called to testify.

As explained in *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004), the Confrontation Clause of the Sixth Amendment bars "admissions of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Petitioner asserts that the investigative report was testimonial in nature, and therefore Dr. DeFatta's description and reliance upon that report was a violation of the Sixth Amendment.

This claim must fail. First, it is unlikely that the investigative report could be considered "testimonial" in nature, and "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law. . . ." *Id.* at 68. While "testimonial" was not comprehensively defined by the court in *Crawford*, nor in the Court's opinions since then, the Court held in *Davis v. Washington*, 547 U.S. 813, 822 (2006) that in the context of police interrogation, statements are testimonial when there is no ongoing emergency and the "primary purpose if the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."

While this definition is not particularly helpful here, it is clear that the district court in denying this claim did not unreasonably apply Supreme Court precedent. Indeed, there is a consensus in the courts that autopsy reports do not constitute testimonial evidence. *See United States v. De La Cruz*, 514 F.3d 121, 133 (2008) (holding that testimony by medical examiner who did not perform autopsy but relied on another's autopsy report and crime scene photographs did not violate Confrontation Clause because autopsy reports fell within the business records hearsay exception and are regularly relied upon by experts in this field); *United States v. Feliz*, 467 F.3d 227, 229 (1006) ("Because we conclude that autopsy reports are not testimonial within

the meaning of *Crawford*, and thus, do not come within the ambit of the Confrontation Clause, we find no constitutional error in the admission of the autopsy reports.").

Certainly, if a medical examiner who did not perform the autopsy may rely on and introduce into evidence the autopsy report, a forensic pathologist such as Dr. DeFatta, who did indeed perform the autopsy, ought to be able to rely upon the investigative report regarding the victim's body shortly after his death. Furthermore, here the report was not admitted into evidence, but rather used to inform Dr. DeFatta's expert opinion. The introduction of opinion testimony does not violate the Confrontation clause when experts rely on their own independent judgment, even if it is based on inadmissible evidence, so long as they are not simply "parroting" the out-of-court testimonial statements. *United States v. Kamahele*, 748 F.3d 984, 1000 (10th Cir. 2014). Here, it was clear that Dr. DeFatta was using his independent judgment to assess the findings in the report. Thus, even if one could find that the report was an inadmissible testimonial statement, Dr. DeFatta's mere reliance upon the report in forming his expert opinion would not violate the Confrontation Clause.

Thus, for the foregoing reasons, Sylve is not entitled to federal *habeas corpus* relief on this claim.

### 2. Outside influences denied Sylve a fair trial

Sylve asserts in his second claim that the jury was affected by outside influences, specifically referencing the media exposure of two jurors, which he argues violated his right to a fair trial. This claim must fail, as there is no indication that the state court's decision denying relief on this claim was contrary to, or an unreasonable application of, clearly established federal law.

The Sixth Amendment guarantees criminal defendants a right to a fair trial by an impartial jury. U.S. Const. Amend. VI. As the trial court correctly noted in its opinion denying post-conviction relief, a jury's verdict must be based solely on the evidence developed at trial. *Smith v. Phillip*, 455 U.S. 209, 217 (1982). However, an impartial jury does not necessarily mean a jury completely ignorant of the facts and issues involved in a case. *Willie v. Maggio*, 737 F.2d 1371, 1379 (5th Cir. 1984) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). In addition, the "mere existence of any preconceived notion of guilt or innocence of an accused, without more, is insufficient to rebut the presumption that a prospective juror is impartial if the juror can lay aside his or her impression and render a verdict based the evidence presented in court." *Id.*

Here, Sylve contests that two juror statements regarding media exposure show that he was denied a fair trial. There were two instances during his trial in which jurors mentioned hearing something about the trial when polled by the judge. First, one juror testified that his father told him the verdict in Sylve's wife's trial.[13] Second, one juror testified that he saw a headline about the case on a news website when he was checking the weather.[14] He stated that he did not read the article.[15]

Both jurors testified that this information would not affect their impartiality.[16] The statements show that the jurors learned very little. One learned only of a verdict in Sylve's wife's trial, and one only read a headline—which certainly does not suggest that either juror had any preconceived notion of guilt—which even if it did, would not be sufficient to prove impartiality, standing alone. Under the standards set forth above, Sylve has simply not proven that either juror was actually partial—rather his assertion is purely speculative. Furthermore,

---

[13] State Rec., Vol. 2 of 4, Trial Transcript, 9/23/08, p. 265-66.
[14] State Rec., Vol. 2 of 4, Trial Transcript, 9/24/08, p. 410-12.
[15] *Id.*
[16] State Rec., Vol. 2 of 4, Trial Transcript, 9/23/08, p. 265; State Rec., Vol. 2 of 4, Trial Transcript, 9/24/08, p. 411.

Sylve's own counsel shared the verdict in his wife's case during the closing statement[17]—she had pled guilty, which would tend to support, rather than contradict Sylve's defense theory that he was a mere bystander in his wife's abuse of the child. Under these circumstances, the state court's decision was not contrary to, nor an unreasonable application of, federal law and Sylve is not entitled to federal *habeas corpus* relief on this claim.

### 3. Ineffective assistance of counsel

Sylve argues in his third claim that he received ineffective assistance of counsel when his trial counsel failed to object or request a mistrial regarding the two statements from the jurors that Sylve contends showed partiality from outside influences, and when counsel failed to raise the issue on his direct appeal.

The United States Supreme Court has established a two-pronged test for evaluating claims of ineffective assistance of counsel. Specifically, a petitioner seeking relief must demonstrate both that counsel's performance was constitutionally deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 697 (1984). A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir.1993); *see also Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, *i.e.* deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. *Strickland*, 466 U.S. at 697.

To prevail on the deficiency prong of the *Strickland* test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance

---

[17] State Rec., Vol. 2 of 4, Trial Transcript, 9/24/08, p. 448.

is deficient if it falls below an objective standard of reasonableness." *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. *See Strickland*, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (*quoting Strickland*, 466 U.S. at 690). A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. *See Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir.1986); *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985).

To prevail on the prejudice prong of the *Strickland* test, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." *Crockett*, 796 F.2d at 793.

Because the state courts rejected petitioner's ineffective assistance of counsel claims on the merits and because such claims present a mixed question of law and fact, this court must defer to the state-court decision unless it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002). Moreover, the United States Supreme Court recently explained that, under the AEDPA, federal *habeas corpus* review of ineffective assistance of counsel claims is in fact doubly deferential:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Ibid.* "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Knowles v. Mirzayance*, 556 U.S. 111, ——, 129 S.Ct. 1411, 1413–14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

*Harrington v. Richter*, 131 S.Ct. 770, 785–86 (2011) (citation omitted). The Supreme Court then explained:

> Surmounting *Strickland's* high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. *The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.* The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under §

14

> 2254(d). *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.*

*Id*. at 788 (citations omitted; emphasis added).

Here, the district court found that the claim lacked merit, setting forth the *Strickland* standard and finding that neither prong was met. The court stated, "[i]t is clear from the record that the court was satisfied with each and every juror's impartiality and rehabilitated any juror where outside media influence was a concern."[18] Under the deferential review performed by this court, it is equally clear that the state district court did not unreasonably apply federal law, nor reach a decision contrary to it, on this claim.

Generally, the failure to object, "standing alone, does not rise to the level of constitutionally deficient performance." *Rios-Delgado v. United States*, 117 F. Supp. 2d 581, 589 (W.D. Tex. 2000). And "[i]n cases where an accused complains that counsel was ineffective because he did not object to something. . . , the courts grant significant deference, as such actions fall squarely within the ambit of trial strategy." *Id.* Here, it was clear that the decision to object or ask for a mistrial after two jurors admitted to some outside knowledge of the case was a matter of trial strategy to be afforded significant deference. Further, based on the fact that the judge questioned the jurors and they both testified as to their impartiality, there was essentially no reason for defense counsel to object—nor any resulting prejudice from the decision not to do so—as is it clear from the record that an objection would not have created a reasonable probability of a different outcome. Thus, the state district court reasonably applied federal law to hold that this claim was without merit, and thus Sylve is not entitled to federal *habeas corpus* relief on this claim.

---

[18] State Rec., Vol. 3 of 4, Judgment on Post Conviction Relief with Reasons, 8/23/12.

### 4. Insufficient evidence

Finally, Sylve argues that there was insufficient evidence to convict him under the law. The First Circuit rejected this claim on direct appeal, stating:

> When viewing the evidence presented at trial in this case in the light most favorable to the prosecution, we are convinced that any rational trier of fact could have concluded beyond a reasonable doubt that all of the elements of the crime of second degree murder were sufficiently proven. The evidence clearly established that the victim was severely abused while in the defendant's care. The four-year-old child was battered, neglected, and deprived of food. The medical testimony at trial clearly indicated that the child's death was due to battered-child syndrome. The medical testimony detailed the existence of fresh or recent abusive wounds and reasonably supports the conclusion that the victim was beaten prior to his death. Viewing all of this evidence, together with the defendant's statements to the investigating detectives and his trial testimony, wherein he admitted that he occasionally and intentionally struck the victim in an attempt to get him to cry, any rational trier of fact could have concluded beyond a reasonable doubt that the defendant's abusive actions contributed, at least in part, to the painful injuries suffered by the victim and leading to his death. Moreover, based upon the defendant's untruthfulness during the investigation of the offense as to when the victim received burn injuries, it would not have been unreasonable for the jury to find that he was not credible. From the defendant's dishonesty, an inference of a "guilty mind" can be drawn.

According to Sylve, this conclusion was an unreasonable application of the law because the First Circuit failed to use the standard prescribed by federal law. However, there is simply no basis for this contention.

Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting petitioner's claim unless he shows that the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Taylor v. Day*, Civ. Action No. 98–3190, 1999 WL 195515, at *3 (E.D.La. Apr.6, 1999), *aff'd*, 213 F.3d 639 (5th Cir. 2000). It is clear that Sylve has not made the showing in the instant case. Claims of insufficient evidence are to be analyzed pursuant to the standard set forth in *Jackson v.*

*Virginia*, 443 U.S. 307 (1979), which held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. Importantly, "[t]he *Jackson* inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit.'" *Santellan* v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting *Herrera v. Collins*, 506 U.S. 390, 402 (1993)) (emphasis added). Therefore, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.... Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Cavazos v. Smith*, ––– U.S. –––, –––, 132 S.Ct. 2, 4, 181 L.Ed.2d 311 (2011). Moreover, as the United States Fifth Circuit Court of Appeals has observed: "[A] state prisoner's burden is especially heavy on habeas review of the sufficiency of the evidence. The jury's finding of facts will be overturned only when necessary to preserve the fundamental protection of due process of law." *Perez v. Cain*, 529 F.3d 588, 594 (5th Cir. 2008) (quotation marks omitted). Further, because the state court's decision applying the already deferential Jackson standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact "twice-deferential." *Parker v. Matthews*, –––U.S. –––, –––, 132 S.Ct. 2148, 2152, 183 L.Ed.2d 32 (2012); *see also Coleman v. Johnson*, ––– U.S. –––, –––, 132 S.Ct. 2060, 2062, 182 L.Ed.2d 978 (2012).

Under these stringently deferential standards of review, Sylve is not entitled to relief. Sylve was convicted of second degree murder where the killing occurred during the perpetration

of cruelty to a juvenile victim. Under Louisiana law, this crime entails either: (1) the defendant intentionally abused or criminally neglected the victim, resulting in the infliction of unjustifiable pain or suffering, and ultimately, death; or (2) that the defendant negligently abused or neglected the victim, causing the infliction of unjustifiable pain or suffering, and finally, his death. *See* La. R.S. 14:30.1(A)(2)(b). The record includes an abundance of facts which suggest that the defendant either intentionally or negligently abused or neglected the victim which caused the infliction of unjustifiable pain, and ultimately his death. Sylve's argument does not specify why or how the evidence against him was insufficient. Instead, his claim just restates the federal standards and concludes, without support, that the First Circuit failed to apply them, or applied them in an objectively unreasonable manner. This argument lacks merit. The state court's decision was objectively reasonable and Sylve is not entitled to federal *habeas corpus* relief on this claim.

**RECOMMENDATION**

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by John Sylve be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).[19]

New Orleans, Louisiana, this __15th__ day of ____December____, 2014.

_____
**SALLY SHUSHAN**
**UNITED STATES MAGISTRATE JUDGE**

---

[19] *Douglass* referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.